SAMUEL MARSHALL

*v.*

JOHN C. ENDER.

*Filed at Ottawa June 16, 1888.*

CONTRACT OF INVESTMENT—*evidence as to transfer and ownership of securities.* A deposited with a loan broker about $1800 for investment, who had in his hands a bond for $2000, then past due, belonging to another, and indorsed in blank. The broker entered upon his books a charge to A of $2000, and a credit of $1800, and also a credit of $80 interest, and extended the time of payment to the debtor, taking coupon notes for the interest, payable to himself, and an agreement to pay the bond to him, and about two months thereafter sold and transferred the bond and coupon notes to B, to whom he afterward paid the interest: *Held*, on a review of all the evidence, that as between A and B, the latter was the owner of the bond and coupon notes.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Messrs. BLANKE & CHYTRAUS, and Mr. FRANCIS LACKNER, for the appellant.

Mr. ISAAC E. ADAMS, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

In the bill of complaint filed by Benjamin Lichtenstein in the circuit court of Cook county, it was alleged he was the owner of certain real estate described, subject to an indebtedness of $2000, created thereon by the former owner, Carl M. Carlson, his wife, Carin, joining in the execution of the trust deed to Lyman Baird to secure the same; that such indebtedness was due, and that he was ready and willing to pay the same so soon as it could be ascertained who was the true owner; that one Samuel Marshall claimed to be the owner, and that one John C. Ender also claimed to be the owner, and the prayer of the bill is, that these respective claimants be required to interplead and settle their rights in the premises between themselves,—complainant offering to pay the amount due and secured on the property to whichever one of claimants the court should find it belonged. A decree was accordingly entered, in conformity with the prayer of the bill, requiring the claimants to interplead, and each one to state his claim to the indebtedness in question, which they did, in the usual form in such cases. On the final hearing of the cause the court found that John C. Ender was the owner of the indebtedness, and entered a decree that complainant pay the same to him. That decree, on the appeal of Samuel Marshall, was affirmed in the Appellate Court for the First District, and he brings the case to this court on his further appeal.

The real question in the case is much more one of fact than of law. It is as to the ownership of the indebtedness secured upon the property of complainant. There is no conflict in the evidence as to some of the facts. Both parties claim to have bought the bond given by Carl M. Carlson, with the trust deed

to Baird, by which it was secured, from Charles A. Schmidt, who was a loan broker. Originally the bond was made payable to Francis Bradly.. Afterwards he sold and assigned the bond to Miss Nancy Swift, without recourse, and Miss Swift indorsed it in blank without recourse. In that condition, the bond, the trust deed, and perhaps other papers connected with the loan, came to the possession of Schmidt. Ender, in his answer, claims that on or about the 6th of September, 1881, Schmidt, for value, sold, assigned and transferred to him all the right, title and interest in the bond and trust deed, and that since that date he has been the owner and holder of the same ; and Marshall, by his answer, alleges that on or about the 15th day of July, 1881, he purchased the bond and trust deed from Nancy Swift, by whom they were indorsed in blank and delivered to him, by which he became the owner, and that on receiving the same he left the bond and other papers with Schmidt, for safe keeping, and for the collection of interest that might thereafter become due. It is quite clear, from the evidence, that at the time both claimants purchased the bond it was over-due by its terms, but the time for payment had been extended by Miss Swift, the former owner. Both claimants alleged they bought the bond for the purpose of investment, that they might receive interest upon the funds employed in making the purchase.

There is another fact in the case about which there is no controversy,—that is, that after the bond came to the possession of Schmidt, on the 15th day of July, 1881, he took an agreement to himself from the legal representatives of Carl M. Carlson, whose death had occurred prior to that time, in which it was recited they were indebted to Schmidt in the sum named in the bond, and secured on the property of Carlson that had descended to them on his death ; and in consideration that Schmidt would extend the time of payment until July 15, 1884, they agreed to pay him the principal and interest of the bond. Coupons for the semi-annual interest were executed by the legal representatives at the same time, bearing even date with the

agreement,—July 15, 1881,—payable to Schmidt or his order. It will be noted, the agreement between Schmidt and the legal representatives of the original debtor was made on the day Marshall claims he bought the bond and trust deed from Nancy Swift, and that it was made a month and a half before Ender alleges he purchased the bond of Schmidt. There can be no question, under the evidence in the case, that Ender purchased the bond and trust deed of Schmidt after the making of the renewal agreement with the legal representatives of the original debtor, in good faith, and for a valuable consideration, and that he received the same from Schmidt at the time, and retained the same in his possession until this litigation began, except for a time it was in a bank as collateral security for his indebtedness to the bank. Afterwards that indebtedness was paid, and the bank returned the papers to him. Unless Marshall had a prior and superior right to the bond, it is evident the title of Ender is good, and should be sustained. This court is inclined to concur with the Appellate Court in its conclusion the proof of the facts relied on by Marshall to sustain his claim is "confused, contradictory and unsatisfactory." Schmidt died about the time the original bill was filed, so that his testimony concerning the transaction, which would have been of the utmost importance, is lacking in the case.

As the case now comes before this court, the evidence in support of Marshall's claim is from three sources: First, the testimony of the claimant himself; second, the books of Schmidt; and third, the testimony of a son of the claimant, who was a clerk in the office of Schmidt. The testimony of the claimant is to the effect he gave Schmidt, who was his brother-in-law, $2000 with which to buy the bond from Miss Swift, and that afterwards Schmidt told him that he had bought it, and had the papers in his safe for him. It is not claimed that Marshall ever had the bond and other papers in his actual possession. His explanation for leaving the papers with Schmidt is, that he was a sailor, was away from home on the

lakes much of the time, and had no safe depository for them
at his home.    But his explanation of the details of the trans-
action is so contradictory as to be very unsatisfactory, and that
is no doubt why the trial court did not give more weight to his
testimony.    It is also seen that the testimony of his son, who
was at the time a clerk in the office of Schmidt, throws but
little, if any, light upon the payment of the $2000 to Schmidt
with which to purchase the bond.    The books of Schmidt do
show that Marshall is charged with $2000 paid to Nancy Swift
for this identical bond.    That entry is under the date of July
14, 1881.    Under date of July 11, 1881, Marshall is credited
by Schmidt on his books with $400 received "for investment,"
and under date of July 12, 1881, with $1396, as having been
received from him also "for investment."    That is all the books
show as to the receipt of money to be "invested."    That, of
course, does not make up the sum of $2000, which he alleges
he paid to Schmidt.    On July 15, 1881, which is the date of
the renewal agreement with the legal representatives of the
maker of the bond, Marshall is credited with $80, for interest
due that day on the bond as having been received from them.
The books also show other credits of small sums, irregular in
amount, to Marshall, as having been received from the repre-
sentatives of the maker of this bond, for interest.    But it is
evident that during all the time these sums of money were
being paid to Marshall, Ender had in his possession the origi-
nal bond, the renewal agreement, and the coupons given for
the semi-annual interest, and received payment of the coupons
from Schmidt as they respectively became due.    The most
plausible view that can be taken, and the one most consistent
with the good faith of all the parties to the transaction, is,
that Marshall placed in Schmidt's hands, for "investment,"
certain sums of money, and it may be, and is, doubtless, true,
that Schmidt told him he would invest the sums in this iden-
tical bond in controversy.    But it does not appear, from any
satisfactory evidence in the record, that he did in fact so invest

claimant's funds in this bond, or in any other securities. His books do not show that at the date Schmidt took the renewal agreement and the coupons payable to himself, he had in his hands a sufficient sum of money belonging to claimant with which to pay for the bond in controversy. Nor does it appear that he did receive a sufficient amount before he sold and transferred the bond to the other claimant, Ender. His financial condition was such that Schmidt could not carry the bond long, and it may have been for that reason he sold the bond to Ender, as he did shortly after he purchased and took the renewal agreement to himself. This view of the transaction accords with the conduct of Schmidt in his last sickness. When approached by Marshall concerning the matter, he told claimant if he would wait until he got well again he would make it all right with him. The evidence affords some explanation, although not entirely satisfactory, for the payment of interest to Marshall by Schmidt. He not only had the money he got of claimant about the time he purchased the bond, but he owed him for money obtained long before that transaction. It may have been in consideration of these matters he paid him small sums of money at sundry times, and Schmidt may have thought, if he did not invest Marshall's money for him he certainly ought to pay him some interest on it. The very fact Schmidt took the renewal agreement and coupons to himself, shows he did not intend to buy the bond for Marshall, or any other particular person. He simply bought it so that he could transfer it to any one that would pay for it. As before remarked, he may have honestly intended to invest Marshall's money in this bond, but it seems clear he did not. But when he ascertained Marshall did not have money enough to pay for it in his hands, Schmidt very shortly thereafter sold and delivered it to the other claimant. If this conclusion is not the correct one, it is evident Schmidt deliberately attempted to commit a fraud upon his brother-in-law by taking the securities in his own name,—a conclusion that ought not to be

adopted if one more consistent with honesty and fair dealing can be reached.

The decree of the trial court seems to be warranted by the evidence, and the judgment of the Appellate Court must be affirmed.                               *Judgment affirmed.*