ELIZA R. SWAN, APPELLANT, V. WILLIAM S. CRAIG ET AL., APPELLEES.

FILED FEBRUARY 9, 1905. No. 13,200.

1. Promissory Note: EXTENSION OF DEBT. Where, at or about the maturity of a negotiable instrument, the time of payment of the indebtedness evidenced thereby is extended by a written agreement of the parties upon a valid consideration, the agreement being independent of and collateral to the original contract, such extension does not continue the commercial characteristics of the note as live unmatured negotiable paper.

2. Payment. The maker of a nonnegotiable instrument, who has no notice of a transfer thereof, may make payment to the original payee. *Consterdine v. Moore*, 65 Neb. 296.

2a. ———. One S. by purchase became the owner and holder of a note secured by a real estate mortgage long before its maturity. At or about the time of its maturity, she consented to an extension of the time of payment of the debt evidenced thereby. The original payee of the note, a loan company, made a written agreement in its own name with the payor, extending the time of payment for five years, and at the expiration of such extension again made a second agreement extending the time of payment another four years. These extension agreements after their execution were assigned by the original payee to the holder of the note, who ratified and approved the same and enjoyed the fruits arising therefrom. *Held*, That, by reason of the course of dealings between the parties, payment made to the original payee by the maker, he having no notice of the transfer of the note to S., was a good payment and operated as a discharge and cancelation of the indebtedness, even though the note was not

in the possession of the payee and was not at the time of pay-ment delivered to the maker.

2b. **Equitable Estoppel.** Under the facts as disclosed by the record, *held*, that the principle of equitable estoppel precluded S., the note holder, as against the maker from denying the ownership and authority of the payee to receive payment and thereby dis-charge the indebtedness.

APPEAL from the district court for Burt county: IRVING F. BAXTER, JUDGE. *Affirmed.*

*Montgomery & Hall,* for appellant.

*Hopewell & Singhaus, contra.*

HOLCOMB, C. J.

This is an action brought for the purpose of foreclosing a real estate mortgage executed by the defendants to the Omaha Loan & Trust Company. The plaintiff, appellant here, claims as the indorsee of the note secured by the mortgage before the maturity of·the debt, and in the ordi-nary course of business. The petition is in the usual form with some added allegations to the effect that prior to the maturity of the principal of the indebtedness the plaintiff consented to extend the time of payment for a period of five years, and that thereupon an extension agreement of a "farm mortgage bond" in writing was duly signed, exe-cuted and delivered by the defendants, a copy of which is set forth in the petition. That prior to the maturity of the debt as thus extended, the plaintiff, at the request of the defendants, consented to extend the payment of the said principal indebtedness for a further period of four years, and, thereupon, the defendants executed and de-livered another extension agreement, a copy of which is set forth in the petition. That said extension agreements and coupons for interest to accrue during the periods of extension were immediately after their execution assigned and delivered to the plaintiff by the Omaha Loan & Trust Company with whom the agreements were entered into.

And that thereafter the plaintiff became, and has ever since been, the holder and owner of said extension agreements.

The answer does not admit the assignment of the note and mortgage before maturity, as alleged in the petition. It admits the execution and delivery of the extension agreement and that it was delivered to the Omaha Loan & Trust Company; and also the same admission is made as to the second extension, and that such extension agreements were assigned by the loan company and with the full understanding and belief on defendants' part that the loan company was the holder and owner of the paper evidencing the indebtedness thus agreed to be extended. It is denied that the plaintiff is the *bona fide* owner and holder of the note and mortgage. It is alleged that no assignment of the bond and mortgage or either extension agreement was ever recorded, and also that the defendants received no notice in any manner that plaintiff was or claimed to be the owner of any of the papers evidencing the indebtedness or the security therefor, or the agreements extending the time of payment of the indebtedness. It is also averred that all payments of interest were made by defendants to the loan company, the payee, and that on the 8th day of August, 1901, upon notice and request of the Omaha Loan & Trust Company, the defendants paid to such company the full amount of the principal and of the interest then due, and that such payments were made in good faith and upon the belief that the Omaha Loan & Trust Company was the owner and holder of the paper and entitled to receive payment. The reply consisted of a general denial.

It is disclosed by the record that soon after the execution of the note and mortgage, and before the maturity of the debt, the plaintiff, by purchase in the due course of business, became the owner and holder thereof by assignment. In the assignment, the mortgagee, the Omaha Loan & Trust Company, guaranteed the collection of the principal and the prompt payment of the coupons attached

for interest accruing according to the terms of the principal document. The place of payment was fixed at the Chemical National Bank of New York city. The interest coupons were paid by the makers in all instances to the Omaha Loan & Trust Company. It also appears that as these interest coupons matured, they were presented by and paid to the plaintiff at the Chemical National Bank, the designated place of payment, she never having any communication with the Omaha Loan & Trust Company, the payee. The coupons when surrendered at the place of payment and when paid to the holder were returned to the loan company, who in turn, after stamping most of them "Paid" with the loan company's stamp, sent them by mail to the makers. This appears to have been the course of dealings between all three parties during the entire time the loan was in existence and until the final payment of the principal by the debtor to the loan company. About the time of the maturity of the principal debt according to the terms of the original instruments, the defendant executed a written agreement entitled "extension of farm mortgage bond," which in terms provided that the Omaha Loan & Trust Company agreed to extend the time of payment of the principal debt for five years from maturity, and the defendant on his part agreed to pay the principal sum with interest according to the terms of ten interest notes, payable semiannually, and attached to the extension agreement. About five years afterwards, and just prior to the maturity of the principal debt as extended by the first agreement, the interest coupons in the meantime having been paid, another extension agreement was entered into between the defendant and the Omaha Loan & Trust Company whereby the time of payment of the original indebtedness was again extended for a term of four years, coupons for interest being attached as before to the extension agreement. These extension agreements, it appears, were both soon after their execution assigned to the plaintiff by a proper indorsement thereon by the Omaha Loan & Trust Company, one of the

parties to the agreement. The plaintiff accepted such assignment, thereby acquiescing in and consenting to the extension of the time of payment of the original indebtedness according to the terms and conditions of such agreements. The plaintiff testifies that she consented to the extensions as thus made, but fails to state with whom she dealt in transacting the business. Having testified that she had no communication with the loan company, it is fairly inferable from all the evidence that these agreements were received and accepted by her through the Chemical National Bank, the place of payment of the principal indebtedness and of the interest accruing thereon. At about the time of the maturity of the debt under the second extension agreement, the defendant paid the interest then accrued, together with the principal sum due to the loan company, and this amount was never received by the plaintiff, the loan company shortly thereafter passing into the hands of a receiver. The district court, after trial on the evidence adduced, an epitome of which has been given, found the issues generally in favor of the defendant, and adjudged that the note and mortgage should be canceled. The plaintiff appeals.

1. The vital question in the case is, whether the payment to the loan company, under the facts and circumstances as narrated, operates as a discharge and satisfaction of the debt, and whether the plaintiff is estopped by her conduct and actions in relation to the transaction, from denying the apparent ownership and authority of the loan company to receive payment and cancel the indebtedness. The defendant, as he testifies, and regarding which there is no controversy, declares that in all matters connected with the loan, the extensions of the time of payment, and the payment of interest coupons and the principal, he dealt with the loan company under the belief that it was the owner and holder of the paper, and the one to whom payment might rightfully be made. This belief on his part arose not only out of the original transaction, but also by reason of their subsequent dealings of the

kind and character heretofore referred to. Aside from the fact that the loan company was negotiating real estate loans and dealing in secured negotiable paper such as it might ordinarily be expected to negotiate and dispose of to third parties, there is nothing in the whole transaction which would advise the defendant that the paper in question had been actually indorsed and was held by some third party. Nor was there anything connected with the coupons for interest as they were paid and surrendered, nor the extension agreements entered into, nor the correspondence between the loan company and the defendants which would serve to apprise the latter that the instrument evidencing the original indebtedness and the security thereof had been assigned or indorsed to others, or that their possession and ownership had passed out of the hands of the payee. It is not to be doubted from the evidence that, as a matter of fact, the plaintiff purchased the original note and mortgage before maturity, paying full value therefor. We are satisfied that the note or bond was negotiable in form, and by such purchase the plaintiff became clothed with all the rights of a good faith purchaser of negotiable paper before maturity and entitled to protection as such. It seems reasonably clear that, had no extension been made, payment to the loan company, it not having possession of the note, and the plaintiff having done nothing to warrant the belief that she had constituted the company her agent, with authority to collect the same, would have been unavailing as a defense. It becomes material, therefore, to inquire as to what effect the execution of the extension agreements in the manner they were executed and the participation of the plaintiff in and in connection therewith, and the dealings of the parties with respect thereto has on the rights of the plaintiff and the defendants. It is contended by plaintiff's counsel that such extensions revive and continue the negotiability and commercial character of the note or bond, and that during all of the time covered by the several transactions and till the maturity of the debt according to

the second extension agreement, she continued to be the holder of negotiable commercial paper before maturity, and that defendant dealt at his peril with any one other than the actual owner and holder regarding such unmatured paper. We are unable to accept this contention as being sound. The contract of extension is a simple executory agreement. It is devoid of the characteristics of a negotiable instrument. The loan company, as the ostensible owner of the note and mortgage, agreed to extend the time of payment of the debt for a period of five years, in consideration of which the mortgagors agreed to pay the principal sum when due as thus extended, and interest thereon annually during the time of the extension at a given rate per cent. This contract was a subsequent, separate, and distinct agreement from the one originally entered into which was evidenced by the note and mortgage now in controversy. The new agreement was independent of and collateral to the old one. The note and mortgage after execution were the subject of contract like any other property or chose in action. An agreement to extend the time of payment, like any other agreement affecting the indebtedness or one which might work a rescission of the contract, could, upon a valid consideration, be entered into. The original contract could by a valid subsequent agreement be altered or altogether destroyed. 1 Daniel, Negotiable Instruments (5th ed.), sec. 157. The rule as to construing contemporaneous agreements does not apply in a case of this kind. Nor would the rule as to memoranda on negotiable paper which requires its purport to be collected from its "eight corners" govern. The rule extends no further than that memoranda appearing on the back of negotiable paper affecting its operation must be construed the same as if written on its face. It is true, an indorsement before the day of payment on negotiable paper postponing its maturity has been held to continue the negotiable character of the instrument until the postponed date of maturity. *Sagory v. Metropolitan Bank,* 42 La. Ann. 627, 7 So. 633.

But this is upon the express holding that the indorsement must be considered as incorporated in and made a part of the paper as though the postponed date of maturity had been originally written in the note.   But this cannot be said of the subsequent independent agreement in the case at bar.   On the other hand it is held, where the time of payment of a negotiable note is extended by an agreement indorsed upon the back, one who takes it after its original maturity will be subject to all equities between the parties.   *Marcal v. Melliet,* 18 La. Ann. 223; *Dryer v. Mercantile Bank,* 4 Mo. App. 599.   The contract for the extension for the time of payment of the original indebtedness in the case at bar neither adds to nor takes away from the negotiable characteristics of the note as originally executed.   Such a contract might rest in parol, and if such were the case, it would hardly be contended, we apprehend, that the negotiability of the note evidencing the original indebtedness would be kept alive during the period covered by the agreement of extension.   The same rule as to the effect of the contract upon the negotiability of the instrument would apply either to a written or an oral agreement to extend the time of payment of the indebtedness.   When the note in controversy had matured according to its terms, it was not thereafter subject to transfer by assignment or indorsement as live negotiable paper whose holder would be protected against defenses and equities that might be urged by the payors if it were in the hands of the payee or of those purchasing with notice.   It became after its maturity as any other dishonored negotiable instrument and was thereafter a mere chose in action subject to the laws applicable generally to contract rights and obligations stripped of the protection thrown round live commercial paper.

2. Assuming, then, as we do, that the note in controversy lost its characteristics as unmatured negotiable paper after the time it became due as originally executed, what is the legal status of the parties and how are the rights of the plaintiff to be determined in view of her ac-

tion and conduct in the premises? Each extension agreement was made between the makers and the loan company as payee and as the ostensible owner of the indebtedness. This was done with the consent and authority of the plaintiff, the then legal holder of the paper, that is, she by her acceptance and acquiescence in what had been done ratified the acts of the loan company, and thus expressly permitted them to deal with the paper as though it were their own. Had no extension been made, payment by the debtor to the loan company, it not having possession of the paper, and the plaintiff having done nothing to give it ostensible authority as agent or owner, would have been unavailing as a defense. It may be that, if but one extension agreement had been entered into, and it having been executed sometime before the maturity of the note, the defendants would, notwithstanding the agreement, be charged with notice that the loan company might have negotiated the paper before its maturity and for that reason payment could not be made to the company except at the maker's peril, unless it was shown that the company had possession of the note or authority to receive payment from the actual holder. No such contention, however, can be made as to the second extension, as the note at that time was confessedly near five years past due. The mortgage at that time stood as security for a nonnegotiable instrument, and the mortgagor was justified in assuming that it was yet owned by the mortgagee, and in the absence of notice that the paper had been assigned, could with safety pay the mortgagee. *Consterdine v. Moore,* 65 Neb. 296. At the time of the second extension of time of payment, and at all times thereafter, the principal note had long since matured. Any one to whom it was offered would discover from an inspection that it had been dishonored. Evidence of an extraneous character, to wit, the extension agreement, would have to be resorted to in order to show that a date beyond that fixed by the terms of the note had been subsequently agreed upon for its payment. In other words, it was a new, separate, and

distinct agreement, by which it could be shown that the parties had upon a good consideration agreed that the date of payment should be postponed. The loan company, it is true, had no original authority to extend the loan; but when the extension agreements were made in its name and assigned to the plaintiff, she ratified and approved its action in that regard, and in this way not only made the loan company her agent for that purpose, but in truth, by this course of dealing, permitted the company to hold itself out and to deal with the paper as though it was the legal owner and holder thereof. The contracts, and each of them, on their face purport to have been made between the maker and the payee as debtor and creditor respectively. The plaintiff's approval of these extension agreements and her acceptance of the fruits derived therefrom was a ratification of the company's acts in that regard and a ratification of the representations made by the company to the defendants which, impliedly at least, were to the effect that it was still the owner of the note and mortgage with power and authority to enter into the contract and extend the time of payment as therein agreed upon. By the plaintiff's acceptance of the fruits of these transactions, her failure to notify Craig of the true state of affairs and disabuse his mind of the belief that he was dealing with the owner, or to disclose to him the fact that she had purchased the same knowing, as she must have known from these extension agreements coming into her possession, that defendant was dealing with the company as the owner, she is now, it would seem, on well-defined equitable principles, estopped from questioning the legality of the payment made by the debtor to the ostensible owner of paper. The plaintiff as well as the defendant is charged with knowledge of the law. She is charged with knowledge that the time of payment which was extended under the agreements entered into between the loan company and the defendants does not extend the commercial character or negotiability of the note evidencing the indebtedness forming the basis of such agreements. She

must have known, therefore, that by allowing the loan company to make these extensions in its own name, and to deal with the paper as its own, this would lead the defendant to believe that the loan company still owned the paper, and, its negotiability having long since ceased, that he might safely pay the loan to the company in the absence of notice that it was not the real owner. She ought not now to be permitted to complain of the payment of this paper to the original payee, she herself by her action and conduct having led the maker to believe that the loan company was still owner. The case as presented seems to be one where one of two innocent persons must suffer by reason of the wrongful act of a third. It is a familiar principle that the loss in such a case must rest upon the one who placed it in the power of the third person to commit the wrong. Applying the principle to the case at bar, it seems reasonably clear that the defendant ought not again to be required to pay the obligation which he has once discharged by paying, in the honest belief which was induced by plaintiff's conduct, and upon reasonable grounds for the entertaining of such belief to one who was entitled to receive the payment and cancel the obligation. For cases analogous in principle to the one under consideration illustrating and applying the doctrine of equitable estoppel, see *Fowle v. Outcalt,* 64 Kan. 352, 67 Pac. 889; *Fields v. Carney,* 63 Tenn. 137; *Morgan v. Neal,* 7 Idaho, 629, 65 Pac. 66; *Marshall v. Ender,* 125 Ill. 370, 17 N. E. 464. The conclusion we reach is that the payment made to Omaha Loan & Trust Company by the defendant was effective as a discharge and cancelation of the mortgage indebtedness and that the decree of the district court should be affirmed, which is accordingly ordered.

AFFIRMED.